## DECLARATION of CALEB T. ENK

I, CALEB T. ENK, do hereby declare:

## BACKGROUND/EXPERIENCE

1.   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Portland, Oregon Post of Duty and have been so employed since September 2005.

2.   I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. During this training, I received instruction relating to the investigation of firearms violations. I have been involved in multiple investigations involving the illegal trafficking, illicit sales, and unlawful possession of firearms.

## PURPOSE OF THE DECLARATION

3.   This declaration is made in support of the Complaint, *in rem,* for the firearms described in Exhibit 1.

## SUMMARY OF INVESTIGATION

4.   2nd Amendment Guns, LLC, is a Federal Firearms Licensee (FFL), #993033013A01064. The license was originally issued on December 5, 2006. The responsible persons on the license are Wilson Lee Clow, Jr. and Lynne Ann Clow. Oregon Secretary of State records show that 2nd Amendment Guns, LLC is registered as an active domestic limited liability company with Wilson L. Clow, Jr. listed as the manager and Lynne A. Clow listed as the registered agent and manager. Wilson Lee Clow, Jr. (Clow, Jr.) is the store manager for 2nd Amendment Guns, LLC and has no felony convictions. Lynne Ann Clow is

**Declaration of Caleb Enk**

Clow Jr.'s wife and is the store owner for 2nd Amendment Guns, LLC. She has no felony convictions.

5.   As described more fully below, on multiple occasions, 2nd Amendment Guns, LLC, through its employee Wilson Lee Clow, Jr., willfully sold firearms to a person knowing or having reason to believe such person had been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(d)(1). Clow demonstrated a pattern and willingness to unlawfully sell any firearm on display to a person he believed was prohibited from possessing firearms. Clow's wife Lynne, who was the store owner for 2nd Amendment Guns, LLC, assisted in at least one of these sales and had knowledge of another. Furthermore, I believe Clow willfully encouraged and allowed a prohibited person to bring a non-prohibited person into the store for the purpose of filling out the required ATF Form 4473 so the prohibited person could acquire a firearm. Clow willfully allowed a third party to fill out the paperwork before transferring the firearm to a prohibited person. In addition, I know FFLs are required to keep and maintain accurate and complete records of all firearm acquisitions and dispositions. Law enforcement depends on the accuracy of this information so that, in the event a firearm is recovered after the commission of a crime, it can be traced to the original purchaser. Clow and 2nd Amendment Guns, LLC, by failing to document the actual purchaser of the firearms, willfully made false entries and representations into their records in violation of 18 U.S.C. §§ 922(m). I further believe that Wilson Lee Clow, Jr. transferred firearms to the CI without noting in his records, as required to be kept pursuant to 18 U.S.C. § 923, the name, age, and place of residence of the CI, in violation of 18 U.S.C. § 922(b)(5), and without performing the required background check, a violation of 18 U.S.C.

**Declaration of Caleb Enk**

§ 922(t). Thus, as discussed below, there is probable cause to believe firearms seized from the residence and garage of Wilson Lee Clow Jr and Lynne Clow and the premises of 2nd Amendment Guns, LLC, were used or intended to be used in any manner or part to commit or to facilitate the commission of a violation of 18 U.S.C. §§ 922(b)(5), 922(d)(1), 922(m), and 922(t). The firearms, therefore, are subject to forfeiture under the authority of 18 U.S.C. § 924(d), which authorizes the seizure and forfeiture of any firearms involved, used, or intended to be used in any willful violation of 18 U.S.C. § 922.

6. The following information, facts, and occurrences are the result of my personal experience, knowledge, investigation, and review of electronic surveillance recordings relative to this investigation, as well as conversations with witnesses and other law enforcement officers, and Clow, Jr.

## STATEMENT OF PROBABLE CAUSE

7. In February 2012, I was contacted by the Rogue Area Drug Enforcement (RADE) team concerning Clow, Jr. RADE asked me if Clow Jr. was a Federal Firearms Licensee (FFL). I confirmed that Clow, Jr. was an FFL operating 2nd Amendment Guns, LLC, at 2701 Coed Place in Grants Pass, Oregon. RADE informed me that Clow Jr. also operated a medical marijuana grow site at his residence, 2701 Coed Place in Grants Pass, Oregon. I also had previous conversations with different law enforcement officers who expressed concerns that Clow Jr. was selling firearms to prohibited individuals, including convicted felons and drug users.

8. In March 2012, I queried 2nd Amendment Guns, LLC, through E-Trace, an ATF electronic database used to trace firearms recovered in connection with crimes. I noted six

**Declaration of Caleb Enk**                                                    EXHIBIT A

results from 2010 to 2011 where 2nd Amendment Guns, LLC, was the FFL that sold a firearm which had later been recovered in connection with a convicted felon and/or drug-related crimes. As a result, I initiated an investigation on 2nd Amendment Guns, LLC for possible unlawful firearms transfers.

9.   I have been working with a confidential informant (CI) in this investigation. CI is not pending any criminal charges, but has numerous felony convictions, including assault, burglary, robbery, possession of weapons, and possession of narcotics, as well as parole/probation violations. CI has agreed to participate in this current investigation for monetary compensation. CI has been an ATF confidential informant for over 7 years. CI has successfully purchased firearms on multiple occasions for ATF, and successfully introduced ATF undercover agents for purposes of purchasing firearms. CI further has provided information on criminal activities of several individuals in the past that has been corroborated and found to be true and accurate. The information and assistance provided by CI has led to the successful prosecution of multiple persons in federal court. CI has provided ATF with ongoing information about criminal activity, including location of criminal targets, details of specific crimes, license plate numbers, phone numbers, and other information related to criminal activity. The information CI provided has been proven to be verifiable and truthful.

10. On March 15, 2012, CI was outfitted with an audio/video recording device and body wire transmitter, and instructed to meet with Clow at 2nd Amendment Guns, LLC. I instructed CI to make contact with Clow and engage in conversation about firearms sales. CI followed me to Clow's place of business, where I observed the CI pull into the driveway of 2701 Coed Place, Grants Pass, Oregon. I took up a position of surveillance and monitored the

**Declaration of Caleb Enk**

wire transmission of the meeting between CI and Clow. I listened via an audio transmitter as CI met an individual who introduced himself as "Will." CI explained that CI had heard about Clow's gun store and wanted to come over to see it. CI explained that CI liked to shoot guns and would buy and sell them on occasion. Clow then began showing CI several different firearms, the first of which was a 5.7mm caliber handgun, which Clow described as the same one which the "Major" from Fort Hood used to kill 13 people. Clow described additional firearms he had for sale including a .45/.410 caliber handgun known as "The Judge," a Smith & Wesson .38 caliber revolver, and an Italian-made .45 caliber 1911 style pistol. Clow went on to show the CI several additional firearms for sale inside of his store, including Kel-Tec rifles and Hi-Point carbines. Additionally Clow showed the CI a lever action .357 caliber pistol and a .223 caliber Kel-Tec pistol. Clow and CI continued to discuss other items which Clow had for sale, as well as firearms which Clow was working on. Additional customers then arrived inside of the shop and CI stated that CI would leave Clow to his other customers as CI left the store. I then followed the CI away from the location of 2nd Amendment Guns, LLC, met with CI at a prearranged location, and recovered the recording and monitoring equipment from the CI. I debriefed CI about the meeting with Clow. CI said that CI observed approximately 75 to 100 firearms displayed inside the store, along with gun accessories and ammunition, and that Clow had described several of the firearms to the CI. CI further stated that Clow mentioned more than one time that silencers and suppressors could be attached to several of the firearms he had for sale. On a later date, I reviewed the audio/video recording recovered from the CI and found it to be consistent with the CI's observations during the operation, as well as my observations during my monitoring of the operation.

**Declaration of Caleb Enk**                                    EXHIBIT A

11. On April 5, 2012, CI was outfitted with an audio/video recording device and body wire transmitter, provided with ATF funds, and instructed to meet with Clow at 2nd Amendment Guns, LLC. I told the CI to inform Clow of the CI's status as a convicted felon, and then attempt to purchase a firearm from Clow. CI followed me to Clow's place of business, where I observed the CI pull into the driveway of 2701 Coed Place, Grants Pass, Oregon. I monitored the wire transmission via an audio transmitter during this time. I listened as the CI made contact with Clow. CI told Clow that CI was interested in purchasing a lever action pistol which Clow had previously described to CI during their meeting on March 15, 2012. CI stated that CI did not want to complete the paperwork associated with the purchase. Clow stated that there was no actual firearms registration paperwork, but that the paperwork was only for background check purposes. CI informed Clow that CI was a convicted felon from a Federal conviction in California in the 1970's. CI stated that CI had to be careful because the conviction was still on CI's record. Clow stated that the firearm CI desired could be run through another person of the CI's choosing and then that person could sell the gun to the CI in a person-to-person transaction. CI asked if CI should bring another person to the store for the background check. Clow stated that this was a possibility, or Clow would use the name of a close friend to run the background check and then Clow would sell CI the firearm. CI agreed and told Clow that CI would pay Clow the asking price of $480.00 for the firearm. Clow stated there was an additional $10.00 charge for the background check for a total of $490.00. CI expressed hesitation, because CI did not want a background check completed. Clow again stated that the other person's information would be used to run the background check, but Clow still had to charge the CI for the cost of completing the background check. CI

**Declaration of Caleb Enk**

and Clow arranged to meet at the residence after 5:00 pm that same day. Clow then told CI

that CI needed to be careful and not get caught with the gun, due to CI's status as a convicted

felon. Clow said if CI did get caught with the gun, that CI should say that CI bought the gun

at a garage sale.

12. I further listened as Clow mentioned that it was possible for the CI to have CI's

felony record expunged, even if the conviction was for a Federal crime in California. Clow

asked if a firearm or violence was involved in the commission of the felony. CI admitted a

firearm had been involved and that CI gave up after CI ran out of ammunition for the gun.

Clow stated that this would most likely mean that CI would not be able to get his felony

conviction expunged. CI then left the location. I followed the CI away and met CI at a

prearranged location, where I recovered the recording and monitoring equipment from the CI.

I debriefed CI about the meeting with Clow. CI said that arrangements had been made for the

CI to meet with Clow after 5:00 pm that same day for the CI to pay for and pick up the lever

action pistol at Clow's residence. CI said that Clow told CI that Clow would use the name of a

close friend to complete the background check, so that Clow could sell the firearm to CI. The

total amount of the transaction would be $490.00. CI had informed Clow of CI's status as a

convicted felon and that was the reason Clow agreed to use his friend's name to run the

background check. I later reviewed the audio/video recording recovered from the CI and

found it to be consistent with the CI's observations during the operation, as well as my

observations during my monitoring of the operation.

13. Later on April 5, 2012, I met with CI to facilitate the firearm purchase from Clow.

CI was again outfitted with an audio/video recording device and body wire transmitter and

**Declaration of Caleb Enk**

provided with ATF funds and instructed to meet with Clow at 2nd Amendment Guns, LLC. I had the CI follow me to the location where I observed the CI pull into the driveway of 2701 Coed Place, Grants Pass, Oregon. I monitored the wire transmission via an audio transmitter during this time and heard CI make contact Clow. Several dogs were barking and yelping, making the wire transmission difficult to hear. A short time later, I heard CI break contact with Clow for a couple of minutes and re-engage Clow in conversation. I heard CI thank Clow and leave the residence. I followed the CI away from the location and met CI at a pre-arranged location, where I recovered the recording and monitoring equipment from the CI. I also retrieved the purchased firearm from CI's vehicle, a Taurus .357 lever action pistol, model Rossi R92RH Ranch Hand, serial number K296188. I showed the firearm to CI, who confirmed it was the firearm CI just purchased from Clow. CI stated that CI contacted Clow at 2nd Amendment Guns, LLC and met him at the gate leading into the property. Clow then went into his house and came back out with a box containing the firearm, opened the box, and showed the contents to CI. CI identified the contents to be the firearm which CI wanted to purchase from Clow. CI then handed Clow $490.00 and thanked Clow for working with the CI in making the sale possible. Clow stated that it was no problem and that he would "burn" all of his books if the police ever came to his store. I later reviewed the audio/video recording recovered from the CI and found it to be consistent with the CI's observations during the operation, as well as my observations during my monitoring of the operation, including a statement made by Clow that "I don't like these fucking rules, we didn't use to have them, now we do…."

**Declaration of Caleb Enk**

14. In April 2012, I caused a subpoena to be served on Oregon State Police Firearms Unit to determine if 2nd Amendment Guns requested a background check for the sale of the Taurus lever action .357 pistol to CI on April 5, 2012. Oregon State Police Firearms Unit records showed that on April 5, 2012, 2nd Amendment Guns, LLC initiated a background check listing Lynne Ann Clow as the purchaser for the Taurus lever action .357 caliber pistol, model Rossi R92RH Ranch Hand, serial number K296188, not the CI.

15. On April 26, 2012, CI was outfitted with an audio/video recording device and body wire transmitter, and instructed to meet with Clow at 2nd Amendment Guns, LLC. I then had the CI follow me to Clow's place of business located at 2701 Coed Place, Grants Pass, Oregon. I monitored the wire transmission via an audio transmitter during this time and heard CI make contact with Clow at the location. During the meet, CI asked Clow about the availability of a "Judge" handgun. Clow stated that he did have one available for sale. CI then asked Clow if he had smoked marijuana recently, to which Clow denied having done so. CI asked how much Clow wanted for the handgun, to which Clow stated the price was $400.00. CI asked if it was possible to waive the fee for background check. Clow agreed to do so. CI then reaffirmed with Clow about CI's felony convictions and asked if Clow would agree to have a family member of the CI's sign for the gun. Clow agreed to this arrangement. CI then asked Clow if he had a quarter-pound for sale (referencing marijuana). Clow stated that he may know someone who did, as CI stated that his "nephew" was in town to make such a purchase, and may be interested in buying a gun from Clow as well. CI told Clow that they had already been dealing with guns, so CI felt comfortable asking Clow about marijuana. Clow stated that he was no longer involved with it. Clow stated that he still uses marijuana in

**Declaration of Caleb Enk**

a lotion form to rub on his muscles as a relaxer and sleep agent. CI then stated he would return with his "nephew" and Clow stated he would set the Judge handgun aside for CI to come pick up later. Clow asked if the "nephew" was an Oregon resident, and CI confirmed that this was the case, and left Clow's place of business. I followed the CI away and met with CI at a previously arranged location, where I recovered the recording and monitoring equipment from the CI. CI informed me CI arranged to meet with Clow later that same afternoon, during which CI would introduce me to Clow so that I could purchase a firearm for the CI. CI further stated that CI had inquired with Clow about purchasing a firearm directly from Clow, without having to complete any paperwork at all, and Clow agreed that this was possible. CI further stated that CI broached the topic of marijuana twice during the meeting with Clow, but that neither time he seemed interested in discussing the possibility of selling marijuana. I later reviewed the audio/video recording recovered from the CI and found it to be consistent with the CI's observations during the operation, as well as my observations during my monitoring of the operation.

16. Later on April 26, 2012, CI and I (acting undercover) went to 2nd Amendment Guns, LLC. CI and I were outfitted with audio/video recording devices and a body wire transmitter. CI and I travelled together in CI's vehicle to 2nd Amendment Guns, LLC located at 2701 Coed Place, Grants Pass, Josephine County, Oregon. CI and I entered the store and I recognized Clow and his wife Lynne Ann Clow inside. I heard Clow tell Lynne Clow that CI was interested in purchasing a Taurus "Judge" handgun, referencing the revolver previously agreed upon during CI and Clow's earlier meeting. I told Clow that I was interested in looking at an FN 5.7 pistol. Clow showed me the FN pistol he had available for sale. Clow stated that

**Declaration of Caleb Enk**

he had a personal 5.7 caliber rifle, which was made on an AR rifle platform. I then observed Clow leave the store and watched through the window as Clow went into his personal residence adjacent to the store and return with a rifle. I asked Clow if he could get the CI "squared away" with me. Clow agreed and asked if it was just the one handgun, referencing the Taurus "Judge" handgun, which the CI had previously picked out. I then told Clow that I wanted to purchase the FN pistol from Clow and asked what would be necessary to do so. Clow handed me the background paperwork and explained that it was not a registration but that any gun sold from the store needed to have a background check with it. Clow then explained the background check process to me and stated that it was meant to confirm that I could buy the gun legally and that the firearm being sold was not stolen. I told Clow that I did not believe there was anything that would prevent me from purchasing a firearm. Clow told me that a felony conviction was the only thing that would prevent me from being eligible to purchase the gun. I then asked Clow for assistance in how to answer the questions listed on the ATF Form 4473. Clow told me that I should answer "Yes" to the first question, indicating that I was buying the guns for myself. I clarified that one of the guns was for the CI. Clow stated that this was alright, because it was a family member transaction. Clow went on to tell me to answer "No" to the remaining questions. I asked additional questions of Clow regarding the form, specifically the question concerning illegal drug use. I stated that I occasionally smoked marijuana. Clow asked me if I stole marijuana and I responded that I did not. Clow said that I was not an unlawful user. Clow then walked me through completing the remainder of the form. I then handed the paperwork and my undercover identification to Clow for use in completing the background check and submitting it to Oregon State Police. I watched as Clow

**Declaration of Caleb Enk**

typed the information into his computer, which was located inside of the store, and listed the FN pistol and the Taurus Judge revolver on the paperwork which I had completed. I then asked Clow about the question on the paperwork regarding convicted felons, and if it was possible to have a felony conviction removed. Clow explained that it was quickly becoming difficult due to pressure from the federal government. I asked CI if CI had checked into the possibility of expunging CI's record. CI stated that CI was unable to do so. Clow told me that this was due to the type of crime committed by the CI, and that it was a violent felony. Clow further stated that with a Class A felony, there is nothing that can be done to remove it. Clow then submitted the information via the internet and told me that I had come back approved to make the purchase. Clow explained to the CI the warranty and other gun-related information for the Taurus "Judge" handgun. Clow then told me that in California, CI could not legally purchase ammunition. Clow then began to hand the Taurus "Judge" over, as CI reached over and took possession of the firearm. CI told Clow that the gun was CI's, not mine. CI gave $400.00 to Clow for the handgun. I then counted out $1,120.00 and handed it to Clow for the FN pistol. The firearms obtained during this transaction are identified as a FN pistol, model Five-Seven, 5.7 x 28 caliber, serial number 386232593 and a Taurus revolver, model "The Judge," .410/.45 caliber, serial number CX946428.

17. In May 2012, I caused a subpoena to be served on Oregon State Police Firearms Unit to determine if a background check had been conducted on the firearms purchased by myself (acting in an undercover capacity) and CI on April 26, 2012. OSP records confirmed that April 26, 2012, 2nd Amendment Guns, LLC initiated a background check for a FN pistol, model Five-Seven, 5.7 x 28 caliber, serial number 386232593 and a Taurus revolver, model

**Declaration of Caleb Enk**

The Judge, .410/.45 caliber, serial number CX946428, claiming that my undercover

identification had been listed as the purchaser of both firearms. In fact, the CI had purchased

the Taurus revolver, model The Judge, .410/.45 caliber, serial number CX946428.

18. On August 2, 2012, CI was outfitted with an audio/video recording device and

body wire transmitter, and instructed to meet with Clow at 2nd Amendment Guns, LLC. I

then followed the CI to Clow's place of business, where I observed the CI pull into the

driveway of 2701 Coed Place, Grants Pass, Oregon. I monitored the wire transmission via an

audio transmitter and heard CI make contact with Clow outside of the residence. CI and Clow

talked about the inventory of firearms Clow had available for sale. CI asked Clow if

everything in the store was available for sale to the CI and if there was anything that the CI

could not buy. Clow told the CI that everything was for sale and was available to the CI. CI

asked Clow about the possibility of not doing any paperwork, since Clow was aware that the

CI was a convicted felon. Clow agreed that this was possible and then offered to show CI

several firearms for sale, which were not part of Clow's store inventory and were "off the

books." CI and Clow walked over to Clow's house. CI and Clow entered the residence and

Clow showed CI several firearms in a room, which were available for sale "off the books."

Clow and CI discussed several different firearms and Clow left the room to retrieve a few

handguns to further show CI more guns that could be purchased. CI confirmed that no

paperwork would be necessary to complete the transaction, to which Clow agreed. CI also

asked Clow if he would be willing to sell firearms to additional individuals who were

convicted felons. Clow stated that he would rather deal with the CI directly, but was willing to

facilitate firearm transfers through the CI, if CI brought the money to Clow. CI then paid

**Declaration of Caleb Enk**

Clow $450.00 for a firearm. CI then asked Clow about the possibility of obtaining a price list of firearms available for sale. Clow agreed and typed one for the CI. Upon receipt of the firearm and list, CI left Clow's place of business. I followed the CI away and met CI at a previously arranged location, where I recovered the recording and monitoring equipment from the CI. I also retrieved the purchased firearm from CI's vehicle, a Sig Sauer .40 caliber pistol, model SP2022, serial number 24B101785, and the list of firearms that Clow had prepared for CI. I showed the firearm to CI, who confirmed it was indeed the firearm which CI had purchased from Clow. CI then informed me that CI drove up to Clow's residence, parked in the driveway, and met Clow outside of the residence. CI stated that Clow was on the telephone during the initial contact, but that CI and Clow entered the store together. CI asked Clow if everything was available for sale. Clow confirmed that everything was for sale and available to the CI for purchase. CI again informed Clow the CI was a convicted felon and further asked Clow about the possibility of Clow selling firearms to associates of the CI, who were also convicted felons. CI stated that Clow declined this offer, in that he would rather deal with just the CI. CI told me that he asked Clow if it was possible to "phony up" the paperwork with regards to a potential gun purchase again and then Clow offered to show and sell CI firearms which were "off the books." CI went with Clow to Clow's residence. CI entered a room on the left as soon as they went inside of the house, where Clow showed CI several firearms available for sale. CI estimated that there were approximately 30 to 40 firearms in the room, all of which Clow told the CI were available for sale off the books. Clow then went into another room of the house and returned with several handguns, which were also available for sale off the books. CI stated that there were a couple of .38 caliber

**Declaration of Caleb Enk**

revolvers, a Taurus 9mm pistol, a Colt military pistol, and a Sig Sauer .40 caliber pistol, which Clow brought into the room to offer to the CI. CI then asked Clow if it was possible to obtain a price list or inventory sheet depicting what Clow had available for sale. Clow stated that the inventory changed regularly because the guns came and went so fast. Clow then offered to type up a list of samples of firearms he had available for sale off the books. CI asked if it was possible to simply buy the Sig Sauer pistol for cash and leave and Clow agreed. CI then paid Clow $460.00 for the Sig Sauer pistol. Clow gave the CI $10.00 in change, for a total payment of $450.00. CI then carried the pistol back inside of the store, while following Clow inside. CI stated that the list of firearms available for sale had printed off in the store. Clow then handed the list to CI who thanked Clow for the info and the firearm and left the premises to meet with me. On a later date, I reviewed the audio/video recording recovered from the CI and found it to be consistent with the CI's observations during the operation, as well as my observations during my monitoring of the operation. The firearm obtained during this transaction is a Sig Sauer pistol, model SP2022, .40 caliber, serial number 24B101785. The list of available firearms provided to CI by Clow, which depicted several firearms for sale off the books contained the following information:

- Colt 1911 series 80 stainless with 3 mags trigger job, target sights $1000
- Colt 1903 US Army 38 Special 500
- S&W .38 6" barrel police issue and shoulder holster $600
- Springfield XD sub compact .40 S&W with crimson laser grips $750
- Sccy 9mm 10 round carry gun $325
- Taurus 24/7 pro 9mm $420

19. In August 2012, I caused a subpoena to be served on Oregon State Police Firearms Unit to determine if a background check had been conducted on the firearm purchased by CI on August 2, 2012. OSP confirmed that Clow through 2nd Amendment Guns, LLC, had not

**Declaration of Caleb Enk**

requested a background check in connection with the sale of the Sig Sauer pistol, model SP2022, .40 caliber, serial number 24B101785, to CI.

20. When an FFL transfers, at one time or during five consecutive business days, two or more handguns to an unlicensed individual, the FFL is required to prepare a Report of Multiple Sale of handguns (ATF Form 3310.4) and submit such form to ATF no later than the close of business on the day the multiple sale occurs, as required by 18 U.S.C. § 923(g)(3)(A). In May 2012, I searched the ATF On-Line Lead database, which showed 2nd Amendment Guns, LLC reported to ATF that on April 27, 2012, my undercover name purchased two handguns. In fact, CI was responsible for purchasing one of the handguns on April 26, 2012.

21. August 22, 2012, federal search warrants were executed at the residence of Clow, located at 2701 Coed Place, Grants Pass, Oregon and at Federal Firearm Licensee (FFL) 2nd Amendment Guns, LLC located at 2701 Coed Place, Grants Pass, Oregon. I prepared an affidavit in support of those search warrants and the Honorable Mark Clarke signed the warrants on August 21, 2012. Found during the execution of the search warrants were 221 firearms and several documents with evidentiary value.

22. During the execution of the federal search warrant, ATF Industry Operations Investigator (IOI) Caleb Rushing and I interviewed Clow. During the interview, I asked Clow if he had ever sold a gun to a person he knew to be prohibited from firearms possession, specifically a convicted felon. Clow responded "yes" he had done so, and further stated that he sold a firearm to an older man who had informed Clow that he couldn't have guns, but that he wanted to purchase firearms for his son. I asked if he knew the man's name and Clow stated that he did not, but provided a brief description of the male. I asked Clow if he was

**Declaration of Caleb Enk**

aware that it was illegal for him to transfer firearms to a person he knew or believed to be a convicted felon. Clow stated that he did and said "I fucked up". I asked Clow why he did it. Clow stated that he was trying to help an old man out and that Clow could use the money from the transaction because his house was most likely going to be foreclosed on. I asked how many times Clow had done such an illegal transaction. Clow stated that it happened on two occasions, both times involving the same male individual. I asked Clow how much money he was making on the illegal transactions. Clow stated that it was not very much and not any more than he would have made on a legal firearms transfer.

23. I then asked Clow how he knew the male individual was a convicted felon. Clow stated he knew the male was a convicted felon because the male had told him he couldn't have guns and that he had gotten into trouble on a prior occasion. I asked Clow if he conducted background checks through the National Instacheck System (NICS) when selling firearms. Clow stated that he did background checks all of the time. I asked how it was possible Clow performed a background check on the male individual and sold him the firearm, when he was a convicted felon. I asked if Clow had utilized another person's information to pass the background, so that firearm could be sold. Clow stated that he himself completed the ATF Form 4473 and related background check information, transferred the firearm into his possession, and then sold the firearm to the male individual as a person to person transaction. I asked Clow to explain further the steps he took to make the firearm sale. Clow stated that the male individual came into his store and picked out a firearm he wanted to purchase. Clow believed it was this transfer, or the second one, which involved a Taurus 9mm caliber pistol. Clow stated that he filled out the background paperwork utilizing his own

**Declaration of Caleb Enk**

personal information and further used his own personal information to pass the NICS check. Once this was complete, Clow logged out the firearm in the Acquisition & Disposition (A&D) book to himself and then later sold the firearm to the male individual in a person-to-person transaction. Clow told me that he believed he had not technically used his FFL business to sell the firearm to the convicted felon. I asked Clow if the male individual had arrived at the FFL business and inquired with Clow about buying a firearm from the FFL business. Clow confirmed this to be the case. I asked Clow if the male individual had informed him at the FFL business that he was a convicted felon. Clow confirmed this to be the case. I then asked Clow if the male individual, now known to Clow as a convicted felon, had picked out a firearm he wished to purchase from the FFL business. Clow again confirmed that this was true. I then asked Clow if he had made arrangements to sell a firearm which originated from his FFL business to the male individual, whom he knew to be prohibited. Clow agreed that this was true. I then asked Clow if he had specifically conducted a background check on himself and completed the related paperwork to remove the firearm from his FFL store inventory, with the single intent of selling the firearm to the male individual, known to Clow as being a convicted felon. Clow agreed that this was indeed the case and then shook his head and stated that it was stupid of him to do so. I expressed to Clow that it might be very difficult to argue that Clow had not utilized his business to transfer a firearm to a convicted felon when the transaction had originated with the FFL business, involved a firearm listed on the FFL inventory, and had utilized FFL-related background paperwork to facilitate the transfer. I further informed Clow he had potentially committed an additional crime by falsifying the background paperwork and making a false entry into his A&D book. I explained this was due

**Declaration of Caleb Enk**

to Clow's knowledge that the firearm was never intended to be sold to Clow from the FFL store, but rather to be directly transferred to the male individual whom Clow knew was prohibited from firearms possession. Clow agreed that this was the case. I asked Clow why he would have done this. Clow stated that he didn't know and that he was only trying to help the guy out, even though Clow knew it was against the law. Clow further stated that he did not know why he made an exception for this one person, because he had never done so in the past.

24. I then asked Clow if he sold guns to any other individuals who were prohibited from possessing firearms. Clow stated he had not and that he was only involved with two transactions, both involving the same male individual. Clow stated he never sold guns to anyone whom he believed to be a drug user or illegal alien. I asked if Clow had ever utilized any other person's background information to pass firearms off of Clow's A&D books. Clow denied having done so and he had only used his own personal information to do so. I then asked if Clow had ever added firearms to already completed ATF Form 4473's in order to transfer the guns to a person Clow believed was prohibited. Clow stated he had not done so. I asked Clow if he was familiar with the term "straw purchase". Clow stated he was and knew it involved one person buying a firearm directly for another person who was prohibited from firearms possession. I asked Clow if he had ever knowingly participated in facilitating a straw purchase. Clow adamantly denied having ever done so and further stated he worked very hard at preventing this from happening at his FFL store.

25. I then asked about the second transaction which involved the male individual. Clow stated that the same male individual had arrived at his FFL store approximately three

**Declaration of Caleb Enk**

weeks prior to the date of the search warrant and wanted to buy another firearm from Clow.

Clow stated he told the male individual he could not sell him a firearm from his FFL store but

he was willing to sell him a firearm from his personal collection, which was located inside of

Clow's residence. I asked Clow if he told the male individual he had guns for sale "off book",

which were available for purchase. Clow responded yes and this was the case with the second

encounter with the male individual. Clow stated the male individual never came inside of the

store, but rather went inside of Clow's house, and into the family room where Clow sold the

male individual a firearm. I confirmed this was the same male individual whom he had

previously sold a firearm to, and that he was a convicted felon. Clow agreed this indeed was

the case and he knew when he sold the male individual the second gun, he was a prohibited

person. I asked Clow if the firearm he had sold the male individual was part of his FFL store

inventory or was it a personal firearm of his. Clow stated it was a personal firearm of his. I

asked Clow why he did this. Clow stated he again was just trying to help the guy out and

again stated he had "fucked up".

     26. IOI Rushing then inquired as to the inventory of firearms Clow had on his

premises. Clow stated he had store-related inventory locked in three safes which were located

in his garage. Clow further stated he had personal firearms which were stored in his house.

IOI Rushing asked Clow specifically about the personal firearms in his house and if they were

part of the FFL business. Clow stated they were his personal firearms and he listed the guns

on Gunbroker.com for sale. Clow further explained that Gunbroker.com was a website for

buying firearms in an auction format, much like Ebay.com. Clow stated he would personally

acquire firearms from various sources such as garage sales, flea markets, and other places, but

**Declaration of Caleb Enk**

not utilize his FFL to do so. IOI Rushing asked why this was the case when Clow possessed an FFL and could readily use it to acquire guns. Clow stated he believed some individuals would not sell their firearms to a licensed FFL because they may have a fear of the government and did not want a written record with their names on it. IOI Rushing then clarified Clow acquired firearms, not acting as an FFL business representative but as a private individual, and then placed those firearms on Gunbroker.com to sell. Clow confirmed this was the case. IOI Rushing asked Clow if he represented himself as an FFL dealer on the Gunbroker.com website. Clow stated he did not. IOI Rushing asked what the user name was used by Clow on Gunbroker.com. Clow stated it was "LynneClow53". IOI Rushing asked Clow to further describe the details as to how Clow acquired guns and disposed of the firearms on Gunbroker.com. Clow stated he would privately purchase firearms in the manner he had previously described, specifically to sell on Gunbroker.com. Clow stated he would list the firearm for sale on Gunbroker.com and list himself and his wife, Lynne Clow, as contact names. Clow stated he used the FFL business phone number as a contact number because he was in his shop most of the time. Clow further stated when a firearm was sold, he would log it into his consignment book showing an acquisition through himself and then dispose of it in the consignment book to an FFL to which the purchaser chose to have the gun shipped. Clow further stated he used his own FFL business to ship the firearms because it was cheaper to do so. Clow stated he would include a copy of his own FFL license inside of the shipment with the firearm so the receiving FFL had Clow's information for their records. Clow further stated the return address used to make the shipment was 2nd Amendment Guns, LLC (Clow's FFL business).

**Declaration of Caleb Enk**

27. IOI Rushing then asked Clow about his firearms suppliers and who they were exactly. Clow stated he purchased firearms from Lew Horton, CDNN, RSR, MGE, SOG, and Davidson's. Clow stated his main supplier was Davidson's and that was the only supplier to whom he owed any money. I asked how much his debt to Davidson's was. Clow stated he had a line of credit of $10,000.00 with Davidson's and that would be how much he owed them. Clow stated he typically paid off the other suppliers with profits made from the FFL business. I asked how much profit Clow's FFL business was making. Clow stated the online sales were the most profitable and he was clearing about $10,000.00 per month. I asked Clow if he had a figure on how much he was making per gun. Clow stated that it depended completely on the individual gun specifically and that there were times when he actually lost money on gun sales. Clow stated he had a lot of money tied up in expensive firearms which he was trying to sell for a large profit. Clow stated the FFL business survived on the gun sales and that he did not make a lot of money personally as the gun business was more of a hobby.

28. IOI Rushing then asked Clow if he recalled having been visited by ATF in the past for purposes of an FFL compliance inspection. Clow stated he did. IOI Rushing then stated he knew Clow had been previously instructed by ATF that he cannot falsify forms and required records and Clow cannot transfer guns to people he had reason to believe were prohibited from possessing firearms. Clow agreed this was the case. IOI Rushing further stated each time ATF visited Clow's FFL business; he had to sign an Acknowledgment of Federal Firearms Regulations. IOI Rushing stated in light of this, Clow knew some of his activities were unlawful. Clow stated "yes" this was true.

**Declaration of Caleb Enk**

29. Upon completion of the search warrant execution, I identified individuals whose personal firearms had been located and seized at the search warrant scenes. These firearms were found at the search warrant sites for a variety of reasons; including repair, consignment, advertisement, etc. Once identified, and their ownership stake in specific firearms corroborated, I released custody of 46 firearms to 18 individuals.

## CONCLUSION

30. On multiple occasions, as described above, 2nd Amendment Guns, LLC, through its employee Wilson Lee Clow, Jr., willfully sold firearms to a person knowing or having reason to believe such person had been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(d)(1). Clow demonstrated a pattern and willingness to unlawfully sell any firearm on display to a person he believed was prohibited from possessing firearms. Clow's wife Lynne, who was the store owner for 2nd Amendment Guns, LLC, assisted in at least one of these sales and had knowledge of another. I believe probable cause exists that 2nd Amendment Guns, LLC had intent to sell all of the firearms on display had they been presented with a willing buyer.

31. Furthermore, I believe Clow willfully encouraged and allowed a prohibited person to bring a non-prohibited person into the store for the purpose of filling out the required ATF Form 4473 so the prohibited person could acquire a firearm. Clow willfully allowed a third party to fill out the paperwork before transferring the firearm to a prohibited person. In addition, I know FFLs are required to keep and maintain accurate and complete records of all firearm acquisitions and dispositions. Law enforcement depends on the accuracy of this information so that, in the event a firearm is recovered after the commission of a crime, they

**Declaration of Caleb Enk**

can trace the firearm to the original purchaser. Clow and 2nd Amendment Guns, LLC, by failing to document the actual purchaser of the firearms, willfully made false entries and representations into their records in violation of 18 U.S.C. §§ 922(m). I further believe that Wilson Lee Clow, Jr. transferred firearms to the CI without noting in his records, as required to be kept pursuant to 18 U.S.C. § 923, the name, age, and place of residence of the CI, in violation of 922(b)(5), and without performing the required background check, a violation of 922(t).

32. Based on my experience as a Special Agent with ATF and the circumstances detailed herein, I have reason to believe that in the Judicial District of Oregon the property described in Exhibit 1, is subject to seizure and forfeiture as there is probable cause to believe that the remaining 85 firearms seized from the residence and garage of Wilson Lee Clow Jr and Lynne Clow and the premises of 2nd Amendment Guns, LLC, were used or intended to be used in any manner or part to commit or to facilitate the commission of a violation of 18 U.S.C. §§ 922(b)(5), 922(d)(1), 922(m), and 922(t). The firearms, therefore, are subject to forfeiture under the authority of 18 U.S.C. § 924(d), which authorizes the seizure and forfeiture of any firearms involved, used, or intended to be used in any willful violation of 18 U.S.C. § 922.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

DATED this 13th day of January 2016.

*s/ Caleb T. Enk*
CALEB T. ENK
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

**Declaration of Caleb Enk**                                              EXHIBIT A
                                                                          Page 24 of 24